## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**TROY MICHAEL JACKSON**                                          **CIVIL ACTION**

**VERSUS**                                                                        **NO. 22-1003**

**TIMOTHY HOOPER, WARDEN**                              **SECTION: "I"(1)**

## REPORT AND RECOMMENDATION

Petitioner, Troy Michael Jackson, a Louisiana state prisoner, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On March 11, 2016, petitioner was convicted under Louisiana law of first degree murder (Count 1), obstruction of justice by tampering with evidence (Count 2), and possession of a firearm by a convicted felon (Count 3).[1] On April 14, 2016, he was sentenced as follows: life without benefit of probation, parole, or suspension of sentence on Count 1; five years on Count 2; and twenty-five years without benefit of probation, parole, or suspension of sentence on Count 3. It was ordered that those sentences be served concurrently.[2]

On October 12, 2017, the Louisiana First Circuit Court of Appeal held that two patent errors had been committed in the case. First, the Court of Appeal found:

> We note that defendant moved for, and was granted, the appointment of a sanity commission. Although two doctors' reports appear in the record, the trial court does not appear to have conducted a contradictory hearing or made a ruling on defendant's capacity to proceed to trial.
> As a general matter, La. Code Crim. P. art. 642 allows "[t]he defendant's mental incapacity to proceed [to] be raised at any time by the defense, the district attorney, or the court." The article additionally requires that "[w]hen the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution ... until the defendant is found to have the mental

---

[1] State Rec., Vol. 8 of 8, transcript of March 11, 2016, pp. 102-03; State Rec., Vol. 3 of 8, minute entry dated March 11, 2016; State Rec., Vol. 3 of 8, jury verdict form.
[2] State Rec., Vol. 3 of 8, transcript of April 14, 2016; State Rec., Vol. 3 of 8, minute entry dated April 14, 2016.

capacity to proceed." La. Code Crim. P. art. 642. Next, La. Code Crim. P. art. 643 provides, in pertinent part, "[t]he court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed." Last, if a defendant's mental incapacity has been properly raised, the proceedings can only continue after the court holds a contradictory hearing and decides the issue of the defendant's mental capacity to proceed. See La. Code Crim. P. art. 647; State ex rel. Seals v. State, 2000-2738 (La. 10/25/02), 831 So.2d 828, 832-33.

Questions regarding a defendant's capacity must be deemed by the court to be *bona fide* and in good faith before a court will consider if there are "reasonable grounds" to doubt capacity. Where there is a *bona fide* question raised regarding a defendant's capacity, the failure to observe procedures to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial. Seals, 831 So.2d at 833. At this point, the failure to resolve the issue of a defendant's capacity to proceed may result in nullification of the conviction and sentence under State v. Nomey, 613 So.2d 157, 161-62 (La. 1993), or a *nunc pro tunc* hearing to determine competency retrospectively under State v. Snyder, 98-1078 (La. 4/14/99), 750 So.2d 832. Seals, 831 So.2d at 833.

In certain instances, a *nunc pro tunc* hearing on the issue of competency is appropriate "if a meaningful inquiry into the defendant's competency" may still be had. In such cases, the trial court is again vested with the discretion of making this decision as it "is in the best position" to do so. This determination must be decided on a case-by-case basis, under the guidance of Nomey, Snyder, and their progeny. The state bears the burden in the *nunc pro tunc* hearing to provide sufficient evidence for the court to make a rational decision. Seals, 831 So.2d at 833.

Because there is no indication in the record that the trial court held a contradictory hearing following its receipt of the physicians' reports in the record, we conditionally affirm defendant's convictions on counts one, two, and three and remand to the trial court for the purpose of determining whether a *nunc pro tunc* competency hearing may be possible. If the trial court believes that it is still possible to determine defendant's competency at the time of the trial on the charges, the trial court is directed to hold an evidentiary hearing and make a competency ruling. If defendant was competent, no new trial is required. If defendant is found to have been incompetent at the time of trial, or if the inquiry into competency is found to be impossible, he is entitled to a new trial. Defendant's right to appeal an adverse ruling is reserved. See Snyder, 750 So.2d at 855-56 & 863; State v. Mathews, 2000-2115 (La. App. 1st Cir. 9/28/01), 809 So.2d 1002, 1016, writs denied, 2001-2873 (La. 9/13/02), 824 So.2d 1191, 2001-2907 (La. 10/14/02), 827 So.2d 412.[3]

Second, the Court of Appeal found:

We also note patent sentencing error in this case. When a convicted felon is found guilty of possessing a firearm in violation of the provisions of La. R.S. 14:95.1, the sentence shall be imprisonment at hard labor for not less than ten nor

---

[3] State v. Jackson, 232 So. 3d 628, 635-36 (La. App. 1st Cir. 2017); State Rec., Vol. 3 of 8.

> more than twenty years without the benefit of probation, parole, or suspension of sentence and a fine of not less than one thousand dollars nor more than five thousand dollars. La. R.S. 14:95.1(B). In imposing the sentence on count three, the trial court sentenced defendant to twenty-five years at hard labor without the benefit of parole, probation, or suspension of sentence and failed to impose any fine. This sentence is illegally excessive in its term and illegally lenient in its failure to include the mandatory fine. See La. R.S. 14:95.1(B). An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. Code Crim. P. art. 882(A). When the amendment of a defendant's sentence entails more than a ministerial correction of a sentencing error, however, the decision in State v. Williams, 2000-1725 (La. 11/28/01), 800 So.2d 790, 801-02, does not sanction *sua sponte* correction by the court of appeal on the defendant's appeal of his conviction and sentence. See State v. Haynes, 2004-1893 (La. 12/10/04), 889 So.2d 224 (per curiam). Accordingly, we vacate the sentence imposed on count three and, in the event the defendant is found to have been competent at the time of trial, instruct the trial court to sentence him on that count in accordance with law.[4]

In summary: the Louisiana First Circuit Court of Appeal conditionally affirmed petitioner's convictions on all three counts, conditionally affirmed his sentences on Counts 1 and 2, and vacated his sentence on Count 3. Petitioner challenged that judgment by filing a related direct-review writ application with the Louisiana Supreme Court, but that writ application was denied on May 25, 2018.[5]

In the meantime, on February 14, 2018, the state district court had complied with the Court of Appeal's judgment. The district court first found that a *nunc pro tunc* competency determination was possible and that petitioner had been competent to stand trial, holding:

> This case was originally a Division "C" (Judge Timothy Ellender) case. Prior to the end of the 2014 year, Judge Ellender retired, and the assistant district attorney prosecuting this case, Juan Pickett, was elected as district judge for Division "C."
> On February 18, 2015, Judge Juan Pickett recused himself from handling this case. It was then randomly allotted to Division "B," Judge John Walker. Different defense counsel with the public defender's office, Kathryn [sic] Lirette, was assigned as defense counsel. A different prosecutor, Dennis Elfert, was also assigned to handle the prosecution. Thus, in Division "B" defendant's case had a different judge, prosecutor, and defense counsel.

---

[4] Id. at 636-37.
[5] State v. Jackson, 243 So. 3d 566 (La. 2018); State Rec., Vol. 3 of 8.

Trial was held March 8-11, 2016. Neither the Court, State, or defense counsel was aware that a ruling on the sanity commission had not been made despite detailed findings of Dr. Grove and Dr. Vega as set forth in their reports.

The minutes reflect that the original plea of the defendant was "NOT GUILTY" (April 8, 2013; June 10, 2013). On March 23, 2015, defendant appeared in Division "B" after the recusal of Judge Pickett and reallotment to Division "B." On March 23, 2015, defendant entered a "NOT GUILTY" plea. This case was tried to a jury March 8-11, 2016.

The original request for a sanity commission was filed May 21, 2014 in Division "C." The July 10, 2014 report of Dr. George Grove was filed in the record on July 31, 2014. The July 25, 2014 report of Dr. Melonie [sic] Vega was filed in the record on August 7, 2014.

A review of the above reports shows that the medical experts conducted a thorough and detailed examination of the defendant according to the "Bennett" criteria. They reached the same conclusions that defendant was competent, not suffering from a mental disease or defect, and had a rational and factual understanding of the charges and their seriousness. He was also found to have the ability to assist counsel. There was no issue of competency of the defendant at the time of the trial.

It appears that an oversight occurred in the failure of Division "C" to render a ruling on the defendant's competency in light of the clear findings of the sanity commission doctors who agreed that defendant was competent and able to assist counsel.

At no time after the filling [sic] of the May 21, 2014 request for a sanity commission were any issues raised concerning the competency of the defendant or his ability to assist his counsel there [sic] was no plea of not guilty by reason of insanity.

During the time this case was pending in Division "B," the Court observed the defendant, his conduct, and his interaction with defense counsel. There was no unusual or disruptive behavior observed. Counsel did not complain of any problems with defendant.

Based on the above, the Court finds that it was possible to conduct a *nunc pro tunc* hearing. The evidence contained in the expert reports of Dr. George Grove and Dr. Melonie [sic] Vega clearly show the defendant was competent and able to assist counsel at the time of the trial. The evidence was not contradicted.

As a result of the above finding of competency, there is no need to remand this case for further proceedings or new trial.[6]

Second, having reached that conclusion, the state district court then resentenced petitioner on

Count 3 to a concurrent sentence of twenty years without benefit of probation, parole, or

---

[6] State Rec., Vol. 3 of 8, *Nunc Pro Tunc* Hearing – Reasons.

suspension of sentence.[7]  He did not appeal either that competency determination or the new sentence.

After the direct-review proceedings concluded, petitioner began seeking collateral review. First, he filed a *pro se* state application for post-conviction relief on February 25, 2019;[8] however, that application was denied by the state district court on December 8, 2020,[9] and his related writ applications were likewise denied by the Louisiana First Circuit Court of Appeal on March 29, 2021,[10] and the Louisiana Supreme Court on October 19, 2021.[11]  Second, while those post-conviction proceedings were still ongoing, petitioner, through counsel, filed another post-conviction application on April 19, 2021,[12] along with a motion to stay the post-conviction proceedings.[13]  Although the state court record furnished to this Court does not contain a ruling on the motion for a stay, the state's response in this proceeding indicates that a stay was in fact granted and that the second post-conviction application "is still pending in the district court."[14]

On April 7, 2022, petitioner filed the instant federal application seeking habeas corpus relief.[15]  The state filed a response,[16] and petitioner filed a reply.[17]

## I.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> On the evening of February 23, 2013, Sergio Castellanos (the victim) went with his friends to a bar in Houma.  While out at the bar, Castellanos met Ciegie

---

[7] State Rec., Vol. 3 of 8, *Nunc Pro Tunc* Hearing Order dated February 14, 2018.
[8] State Rec., Vol. 4 of 8.
[9] State Rec., Vol. 2 of 8, Order dated December 8, 2020.
[10] State v. Jackson, No. 2021 KW 0189, 2021 WL 1169943 (La. App. 1st Cir. Mar. 29, 2021); State Rec., Vol. 1 of 8.
[11] State v. Jackson, 326 So. 3d 230 (La. 2021); State Rec., Vol. 1 of 8.
[12] State Rec., Vol. 4 of 8.
[13] State Rec., Vol. 4 of 8.
[14] Rec. Doc. 11, pp. 4-5.
[15] Rec. Doc. 1.
[16] Rec. Doc. 11.
[17] Rec. Doc. 13.

Cheramie, who had gone to the bar with defendant and his girlfriend, Brandy Perdue. According to trial testimony, Cheramie, Perdue, and defendant went to the bar that night for Cheramie to meet someone and convince them to give her money or for Cheramie to meet someone to have sex with her for money. Ultimately, Castellanos left the bar with Cheramie, Perdue, and defendant.

After leaving the bar, Cheramie drove Castellanos, Perdue, and defendant to at least one gas station and then around the Houma area. Castellanos was seated in the truck's passenger's seat, while defendant and Perdue sat in the truck's back seat. At some point as they drove, defendant pulled a gun and shot Castellanos three times, resulting in his death. The following morning, defendant directed Cheramie to call her brother, tell him she had shot someone, and ask for his help in disposing of the body. Cheramie's brother called the police after Cheramie came to his house and he observed something slumped in the passenger's seat of her vehicle. After visiting her brother, Cheramie dumped Castellanos's body in a grassy area on the side of Bayou Salle Road. Defendant took some clothing from the victim and the occupants of the truck, and he disposed of it in a waterway near Mechanicville.

Defendant did not testify at trial, but the state introduced a recorded interview that he gave to the police. In this statement, defendant admitted to shooting Castellanos, but stated that he did so in order to protect Cheramie and Perdue. The state also introduced evidence of defendant's September 7, 2005 felony conviction for molestation of a juvenile.[18]

## II. Procedural Defenses

## A. Timeliness

The sole defense raised by the state in its response in this proceeding is that petitioner's federal application was untimely filed. For the following reasons, that defense should be rejected.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a statute of limitations for petitioners seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Specifically, the AEDPA provides:

A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

---

[18] State v. Jackson, 232 So. 3d 628, 631-32 (La. App. 1st Cir. 2017); State Rec., Vol. 3 of 8.

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Subsections B, C, and D of 28 U.S.C. § 2244(d)(1) do not apply in the instant case because petitioner does not allege the existence of a state-created impediment, a newly recognized constitutional right, or a newly discovered factual predicate. Accordingly, as the state argues[19] and as petitioner does not contest,[20] Subsection A is controlling.

Regarding Subsection A, the United States Fifth Circuit Court of Appeals has explained:

The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Because the Louisiana Supreme Court denied petitioner's direct-review writ application on May 25, 2018,[21] his state criminal judgment became final for federal purposes on **August 23, 2018**.

---

[19] See Rec. Doc. 11, pp. 6-7.
[20] See Rec. Doc. 13.
[21] State v. Jackson, 243 So. 3d 566 (La. 2018); State Rec., Vol. 3 of 8.

Accordingly, in order to be timely, his federal application had to be filed within one year of that date, unless that deadline was extended through tolling.

Regarding the limitations period set forth in § 2244(d)(1), federal law provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

Here, after one hundred eighty-five (185) days elapsed, petitioner tolled the federal limitations period by filing a post-conviction application with the state district court on February 25, 2019.[22]    Although the district court denied that application on December 8, 2020,[23] it nevertheless remained "pending" for the purposes of § 2244(d)(2) for the duration of the post-conviction proceedings **if** petitioner continued to seek review at the higher levels of the state court system in a timely manner.  See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004).

In its response in this proceeding, the state argues that petitioner failed to file his related writ application with the Louisiana First Circuit Court of Appeal in a timely manner.  It is true that a litigant normally has only thirty days to seek supervisory review by a Louisiana Court of Appeal. See Louisiana Uniform Rules of the Courts of Appeal Rule 4.3.  It is also true that petitioner did not file his writ application with the Court of Appeal within thirty days of the district court's

---

[22] State Rec., Vol. 4 of 8.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."  Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  Because that date cannot be gleaned from the state court record with respect to the post-conviction application, the Court has simply used the signature date of the pleading as its filing date, in that the pleading was obviously placed in the mail no earlier than the date on which it was signed.  See United States v. Minor, 582 F. App'x 315, 316 (5th Cir. 2014); Estes v. Boutté, Civ. Action No. 19-2289, 2020 WL 1990823, at *2 (E.D. La. Mar. 6, 2020), adopted, 2020 WL 1984331 (E.D. La. Apr. 27, 2020); Crochet v. Goodwin, Civ. Action No. 13-3106, 2014 WL 5093995, at *2 n.10 (E.D. La. Oct. 8, 2014); Thornton v. Terrell, Civ. Action No. 09-1631, 2009 WL 4855743, at *1 n.1 (E.D. La. Dec. 4, 2009).
[23] State Rec., Vol. 2 of 8, Order dated December 8, 2020.

judgment.[24]  Nonetheless, in its opinion denying relief, the Court of Appeal did not indicate that it found petitioner's application to be untimely.[25]  In the absence of any such indication, the undersigned must assume that the Court of Appeal determined the application was in fact timely. See Grillette, 372 F.3d at 775 ("[W]hen the denial of an application is based on untimeliness, Louisiana courts routinely and unmistakably indicate so in their opinions.  Thus, had the Louisiana Court of Appeal decided to reach the merits of the application notwithstanding a determination that the application was untimely, it appears that the court would have indicated any such untimeliness in its opinion." (citations omitted)); see also Bourgeois v. Bergeron, Civ. Action No. 09-3185, 2009 WL 5088756, at *4 (E.D. La. Dec. 23, 2009) ("While one could perhaps argue that the Fifth Circuit is too generous in its assumption that evident untimeliness is always noted without fail by the state courts, this Court may not unilaterally ignore the presumptions employed in Grillette.").  Therefore, the undersigned finds that petitioner's federal limitations period remained tolled for the duration of the post-conviction proceedings in the Court of Appeal.

Moreover, after the Court of Appeal denied relief, petitioner filed a related writ application with the Louisiana Supreme Court.  Because the state does not contest the timeliness of that writ application, this Court finds that the statute of limitations therefore remained tolled based on petitioner's first post-conviction application until the Louisiana Supreme Court denied relief on October 19, 2021.[26]

Furthermore, by the time the Louisiana Supreme Court issued its judgment on the first-conviction application, petitioner, through counsel, had already filed his second post-conviction

---

[24] Because the state district court issued its judgment on December 8, 2020, Rule 4.3 would normally have required petitioner to file his related writ application with the Court of Appeal on or before January 7, 2021.  Here, he did not even sign his writ application until February 5, 2021.  See State Rec., Vol. 2 of 8, writ application.
[25] On the contrary, the Court of Appeal simply denied the writ application without assigning any reasons whatsoever. State v. Jackson, No. 2021 KW 0189, 2021 WL 1169943 (La. App. 1st Cir. Mar. 29, 2021); State Rec., Vol. 1 of 8.
[26] State v. Jackson, 326 So. 3d 230 (La. 2021); State Rec., Vol. 1 of 8.

application on April 19, 2021.[27]  Because that filing triggered a second round of statutory tolling, and because the state concedes that the second post-conviction application has remained pending since filing, the federal limitations period has never resumed running.

Accordingly, when petitioner filed the instant federal application on April 7, 2022,[28] only one hundred eighty-five (185) days of his one-year federal limitations period had elapsed untolled. Therefore, the application was timely filed.

### B.  Exhaustion/Procedural Default

Exhaustion and procedural default are also procedural defenses that can be asserted with respect to a federal habeas application; however, both are **affirmative defenses** that may be waived if the state fails to raise them in its pleadings.  Magouirk v. Phillips, 144 F.3d 348, 357 (1998). Here, the state has **not** raised those affirmative defenses.  Therefore, petitioner's claims will be addressed on the merits.

### III.  AEDPA Standards of Review

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable

---

[27] State Rec., Vol. 4 of 8.
[28] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner has declared under penalty of perjury that his federal application was placed in the prison mailing system on April 7, 2022.  Rec. Doc. 1, p. 13.

determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a

particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."

Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

### IV.  Petitioner's Claims

### A.  La. Rev. Stat. Ann. § 14:30(C)(2) is Unconstitutional

Petitioner states his first claim as follows:

> La. R.S. 14:30(C)(2) is unconstitutional because it violates Article 1, §§ 2, 3, and 17(A) of the Louisiana Constitution of 1974, La. C.Cr.P. art. 780, La. C.Cr.P. art. 782, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution where it removes the procedural safeguards governing crimes considered serious enough to carry the death penalty, and empowers the State to deprive a defendant of his right to trial by jury simply by saying the death penalty will not be sought.[29]

That summary statement of the claim was then followed by a more detailed explanation, but that explanation is muddled at best. Nonetheless, the gist of the explanation is that La. Rev. Stat. Ann. § 14:30(C) violates both Louisiana law and the United States Constitution by allowing a district attorney to deprive a defendant charged with first degree murder of certain rights merely by unilaterally deciding not to seek the death penalty in the case.

The state district court denied that claim, holding:

> Defendant claims La. R.S. 14:30 C(2), first degree murder, is unconstitutional because capital murder requires a unanimous verdict (12 of 12). Revised La. R.S. 14:30 C(2) allows the State to prosecute without seeking the death penalty wherein a nonunanimous verdict of ten of twelve (10 of 12) is required to convict.
> The offense for which defendant was prosecuted occurred in 2013. There were no objections during the trial proceedings to the jury instructions regarding the number of jurors required to convict (10 of 12 – La. C.Cr.P. art. 782) or the constitutionality of La. R.S. 14:30 C(2).
> When there is no objection at trial, claim errors are not preserved for appellate review (La. C.Cr.P. art. 841). A defendant has no standing to appeal the

---

[29] Rec. Doc. 1-1, p. 4.

unpreserved error because he is unable to show he was harmed by the purported error.

Constitutional challenges are not considered by an appellate court unless properly pleaded and raised in the trial court. State v. Hatton, 985 So.2d 709 (La. 7/1/08).

This claim has no merit.[30]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[31] and the Louisiana Supreme Court thereafter likewise denied relief, simply stating, "Denied. Applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[32]

In petitioner's discussion of this claim in his federal application, he focuses primarily on his contention that La. Rev. Stat. Ann. § 14:30(C) violates Louisiana's constitution and laws in various respects. However, those arguments are not properly before this federal court. Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983). Therefore, the issue of whether the state statute violates state law is a matter left to the state courts. See, e.g., Michigan Central Railroad Co. v. Powers, 201 U.S. 245, 290 (1906) ("If conflict with the state Constitution is the sole ground of attack, the supreme court of the state is the final authority …."); Levy Gardens Partners 2007, L.P. v. Commonwealth Land and Title Insurance Co., 706 F.3d 622, 629 (5th Cir. 2013) ("The principle that state courts are the final arbiters of state law is well-settled."); Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991) ("We will not review a state court's interpretation of its own law in a federal habeas corpus proceeding. We do not sit as a 'super' state supreme court in such a proceeding to review errors under state law." (internal citation and quotation marks omitted)).

---

[30] State Rec., Vol. 2 of 8, Denial of Request for Postconviction Relief/Order of Finality, pp. 4-5.

[31] State v. Jackson, No. 2021 KW 0189, 2021 WL 1169943 (La. App. 1st Cir. Mar. 29, 2021); State Rec., Vol. 1 of 8.

[32] State v. Jackson, 326 So. 3d 230 (La. 2021); State Rec., Vol. 1 of 8.

Further, as to his suggestion that La. Rev. Stat. Ann. § 14:30(C) violates the United States Constitution, petitioner provides no clear explanation of that contention in his discussion of his claim.  Rather, he merely suggests in passing, and without any explanation, that the statute violates the "federal right of due process" and the "federal right of equal protection."[33]

Although petitioner has made no effort to further explain his federal claim, it appears that his challenge centers on the fact that, at the time of his prosecution, the district attorney was able to unilaterally choose whether a person being tried for first degree murder would be entitled to the full panoply of rights and protections afforded to those charged with a capital offense or, instead, the lesser rights and protections afforded to defendants charged with non-capital offenses.  The referenced difference was the result of the interplay of La. Rev. Stat. Ann. § 14:30(C) and La. Code Crim. P. art. 782.  Specifically, § 14:30(C) provides:

> (1) **If the district attorney seeks a capital verdict**, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury.  **The provisions of Code of Criminal Procedure Article 782 relative to cases in which punishment may be capital shall apply.**

> (2) **If the district attorney does not seek a capital verdict**, the offender shall be punished by life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. **The provisions of Code of Criminal Procedure Article 782 relative to cases in which punishment is necessarily confinement at hard labor shall apply.**

La. Rev. Stat. Ann. § 14:30(C) (emphasis added).  At the time relevant here, Article 782 read:

> A.  **Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict.  Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.** Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

> B.  Trial by jury may be knowingly and intelligently waived by the defendant except in capital cases.

---

[33] Rec. Doc. 1-1, p. 6.

La. Code Crim. P. art. 782 (version prior to 2018 amendment[34]) (emphasis added).

Therefore, the interplay of those provisions essentially allowed a district attorney to unilaterally decide whether a person charged with first degree murder was entitled to a unanimous jury verdict simply by choosing whether to seek the death penalty in the case – if the death penalty was not sought, a conviction resulted if at least ten of the twelve jurors found the defendant guilty; however, if the death penalty was sought, a conviction resulted only if all twelve jurors found he was guilty.

To the extent that petitioner may be contending that he is entitled to federal relief because the statute allowed for his conviction by a nonunanimous jury, that contention requires little discussion. The death penalty was not sought in petitioner's case, and, at the time, Louisiana law permitted nonunanimous jury verdicts in noncapital cases. Although it is true that the United States Supreme Court subsequently held that the United States Constitution requires a unanimous verdict to convict a defendant of a serious offense in <u>Ramos v. Louisiana</u>, 140 S. Ct. 1390 (2020), that does not aid petitioner. The United States Supreme Court has expressly held that <u>Ramos</u> announced a new rule of criminal procedure which does not apply retroactively on federal collateral review. <u>Edwards v. Vannoy</u>, 141 S. Ct. 1547 (2021).

---

[34] Article 782 was amended in 2018 and, as of the amendment's effective date of January 1, 2019, now provides:

> A. A case in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.

> B. Trial by jury may be knowingly and intelligently waived by the defendant except in capital cases.

La. Code Crim. P. art. 782.

To the extent that petitioner is contending that it was unconstitutional for the statute to provide the district attorney with discretion to prosecute petitioner for a noncapital offense rather than a capital offense, he has offered no authority supporting that contention, and the Court is not aware of any such authority. On the contrary, prosecutors are afforded wide-ranging discretion in charging decisions. For example, Louisiana law expressly provides: "Subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." La. Code Crim. Proc. 61. Further, the United States Supreme Court has similarly observed:

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion. Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.

Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (footnote, quotation marks, and brackets omitted).

Relatedly, to the extent that petitioner is contending that it was unconstitutional to afford the district attorney discretion as to whether to seek the death penalty in a given case, that contention has no merit. Such discretion does not offend the Constitution. See Gregg v. Georgia, 428 U.S. 153, 199 (1976); Anderson v. Quarterman, 204 F. App'x 402, 410 (5th Cir. 2006) ("Anderson next argues that the Texas death penalty statute violates due process, equal protection, and due course of law to a constitutionally impermissible degree because it gives unbridled discretion to prosecutors in determining whether or not to seek the death penalty. Anderson does

not point to any Supreme Court or Fifth Circuit precedent forbidding such discretion, and we have found none.").

To the extent that petitioner seems to be contending that the statute was unconstitutional because it gave the district attorney the authority to deprive some defendants charged with first degree murder (namely, those for whom the death penalty is sought) of the ability to waive a jury trial,[35] that contention is plainly meritless. The contention is based on an implicit assumption that a defendant has a federal constitutional right to demand a bench trial. But, clearly, the United States Constitution confers no such right. Singer v. United States, 380 U.S. 24 (1965); accord United States v. Clark, 943 F.2d 775, 784 (7th Cir. 1991); United States v. Clausell, 389 F.2d 34, 35 (2nd Cir. 1968).[36]

Lastly, to the extent that petitioner is complaining that the offense of noncapital first degree murder overlaps in some respects with the offense of second degree murder, that likewise poses no constitutional concerns. "[S]uch overlap is unremarkable," and "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." United States v. Ross, 948 F.3d 243, 248 (5th Cir. 2020) (quotation marks, brackets, and textual alteration omitted).

## B. Ineffective Assistance of Counsel

Petitioner also asserts several claims alleging that he received ineffective assistance of counsel. Because those claims were denied on the merits by the state courts, he faces even greater obstacles to obtaining relief on the claims in federal court. Specifically, because such claims

---

[35] Under Louisiana law, only defendants not subject to the death penalty may waive a trial by jury and elect to be tried by the judge alone. La. Code Crim. P. art. 780.

[36] It must be noted that there likewise is no such right under Louisiana law. State v. Bazile, 144 So. 3d 719, 729 (La. 2013) ("[T]here is no explicit or implicit federal or state constitutional right to demand trial before a judge sitting alone.").

present mixed questions of law and fact, he is entitled to federal habeas relief only if he shows that the state court decision denying the claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Adekeye v. Davis, 938 F.3d 678, 682 (5th Cir. 2019); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002). For the following reasons, he has not made that showing.

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 697.

When assessing whether counsel's performance was deficient, a federal court must always be mindful that "Strickland does not guarantee perfect representation, only a reasonably competent attorney." Harrington v. Richter, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Id. at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining

counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Strickland's prejudice component is no less exacting. The Supreme Court has explained:

In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

Further, when a petitioner seeks federal habeas review of a Strickland claim denied by the state courts on the merits, the issue is narrower. Specifically, the issue for the federal court on habeas review is "whether the state court's **application of the Strickland standard** was **unreasonable**." Id. at 101 (emphasis added). In other words, "the question is **not** whether counsel's actions were reasonable. **The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard**." Id. at 105 (emphasis added). That makes a petitioner's already difficult task even more so, because it requires the federal court to accord the state court decision "a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Id. at 101; see also id. at 105 ("The standards

20

created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem,

review is doubly so.").  As a result, in effect, the federal court must "afford **both** the state court

**and** the defense attorney the benefit of the doubt."  Woods v. Etherton, 578 U.S. 113, 117 (2016)

(emphasis added; quotation marks omitted).

In the instant case, petitioner summarizes his ineffective assistance of counsel claims as

follows:

> Mr. Jackson received Ineffective Assistance of Counsel when defense
> counsel ("Ms. Lirette") failed to preserve the **BATSON** claim for appeal; denied
> Mr. Jackson the right to testify at trial; failed to object to Mr. Jackson's video
> statement to the police being played to the jury; called Mr. Jackson a liar during
> closing arguments; questioned Mr. Jackson's guilt-or-innocence to the charge of
> obstruction of justice; and failed to present a reliable defense.  Even though these
> errors standing alone clearly show ineffective assistance of counsel, these errors of
> Trial Counsel should also be judged cumulatively for their overall impact on the
> trial.[37]

Each of those contentions will be addressed in turn.

## 1.  Batson

As to petitioner's claim of ineffective assistance with respect to a Batson[38] violation, it

must be noted that petitioner's defense counsel, Kathryn Lirette, asserted a Batson challenge

during voir dire of the first jury panel.  The transcript reflects the following exchange:

> MS. LIRETTE:
> Your Honor, we're going to object to striking – The State has stricken all of
> the black potential jurors on the jury pool.  And we object to that, and we ask that
> he explain his responses.
>
> MR. ELFERT [the prosecutor]:
> Sure.  First of all, it's incorrect to say that we objected to all of the black
> people.  I would suggest that Mr. Scott, Mr. Johnson, Mr. Ray, and Ms. Harvey are
> all black.  Mr. Ray was challenged by the defense for cause.  The State found Mr.
> Ray acceptable and would have accepted him.
> In regards to the other three, I understand that I have to make an explanation
> to respond, Judge.  Mr. Johnson had indicated that he had been on a prior jury.  He

---

[37] Rec. Doc. 1-1, p. 11.
[38] See Batson v. Kentucky, 476 U.S. 79 (1986),

indicated that it had been found not guilty.  As a result, the State had some concerns given that fact.

Mr. Scott, Ms. Pinell, Mr. Thibodaux, and Ms. Harvey, and for that matter, Ms. Lirette, next are all under the age of 35, Judge.  The State has some concerns given the fact that there are some places involving where these individuals went, nightclubs.  These people may be familiar with that.

And as a result, we have made a decision that we would rather go with an older jury in this case to show that there's no familiarity with the places themselves.

There is no indication whatsoever that there is any type of trend of racial bias but rather it's the preference of the State to have a particular type of jury based on age.

THE COURT:
        Ms. Lirette.

MS. LIRETTE:
        Your Honor, I don't think that just saying that we think that they might be going to these places or might be familiar with these places is enough.  And I believe that these people – We should take a look at more than just their age and the fact they might be going.

        The State could have asked them about if they were familiar with these places.  If they were concerned about it, they could have asked them in voir dire.

THE COURT:
        In connection with this matter, the Court has listened to the testimony in connection and jury questions.  As far as Mr. Johnson – The defense is correct.  Also, Mr. Johnson has a brother that's been convicted of selling drugs who has been to the penitentiary.

        The State is correct concerning the age of Mr. Scott.  He is 24 years old.  And Ms. Harvey is 34 at this point.

        The Court will deny the Batson Challenge in this matter.

MS. LIRETTE:
        Note our objection for the record.[39]

Petitioner's ineffective assistance claim is premised on the fact that counsel did not then **renew and preserve** her <u>Batson</u> challenge after the prosecutor accepted young white jurors during the voir dire of the second panel.  Specifically, he contends:

        During the examination of the second panel of prospective jurors, even though the State had previously stated that it was going with an ["]older jury" in the case, the State accepted several white jurors who were under the age of 35.  When the State accepted those white jurors who were under the age of 35, instead

---

[39] State Rec., Vol. 6 of 8, transcript of March 8, 2016, pp. 91-93.

of re-urging her **Batson** challenge, Ms. Lirette remained silent.  She believed that the previous challenge was sufficient, thus failing to preserve the claim for appeal purposes.  This is inexcusable and does not fit the character of a "reasonably competent" attorney.[40]

On direct appeal, the Louisiana First Circuit Court of Appeal noted that counsel did in fact fail to properly preserve the issue; however, the Court of Appeal also indicated that the <u>Batson</u> claim would fail on the merits in any event.  The Court of Appeal stated:

> In his sole assignment of error, defendant argues that the state improperly exercised peremptory challenges against two prospective jurors on the basis of race. In <u>Batson v. Kentucky</u>, 476 U.S. 79, 93-98, 106 S.Ct. 1712, 1721-1724, 90 L.Ed. 2d 69 (1986), the United States Supreme Court adopted a three-step analysis to determine whether the constitutional rights of a defendant or prospective jurors have been infringed by impermissible discriminatory practices.  First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  <u>State v. Handon</u>, 2006-0131 (La. App. 1st Cir. 12/28/06), 952 So.2d 53, 56.  <u>See also</u> <u>Foster v. Chatman</u>, ——— U.S. ———, 136 S.Ct. 1737, 1747, 195 L.Ed. 2d 1 (2016).
>
> To establish a *prima facie* case, the defendant must show:  (1) the defendant is a member of a cognizable group and the prosecutor exercised peremptory challenges to remove venire members of the defendant's race; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of his being a member of that cognizable group.  <u>See</u> <u>Batson</u>, 476 U.S. at 96, 106 S.Ct. at 1723. Without an inference that the prospective jurors were stricken because they are members of the targeted group, the defendant is unable to make a *prima facie* case of purposeful discrimination, and his <u>Batson</u> challenge expires at the threshold. <u>State v. Sparks</u>, 88-0017 (La. 5/11/11), 68 So.3d 435, 468, <u>cert. denied sub nom.</u>, <u>El-Mumit v. Louisiana</u>, 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed. 2d 621 (2012).
>
> The trial court may "effectively collapse the first two stages of the <u>Batson</u> procedure, whether or not the defendant established a *prima facie* case of purposeful discrimination, and may then perform the critical third step of weighing the defendant's proof and the prosecutor's race-neutral reasons to determine discriminatory intent."  <u>State v. Jacobs</u>, 99-0991 (La. 5/15/01), 803 So.2d 933, 941, <u>cert. denied</u>, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed. 2d 707 (2002).  A trial judge may take into account not only whether a pattern of strikes against a suspect class of persons has emerged during voir dire, but also whether the opposing party's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose.  <u>See</u> <u>State</u>

---

[40] Rec. Doc. 1-1, p. 17.

v. Duncan, 99-2615 (La. 10/16/01), 802 So.2d 533, 545, cert. denied, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed. 2d 183 (2002).

The state, in presenting race-neutral reasons for its excusal of prospective jurors, need not present an explanation that is persuasive, or even plausible; unless a discriminatory intent is inherent in the state's explanation after review of the entire record, the reason offered will be deemed race neutral. Handon, 952 So.2d at 58. For a Batson challenge to succeed, it is not enough that a discriminatory result be evidenced; rather, that result must ultimately be traced to a prohibited discriminatory purpose. Thus, the sole focus of the Batson inquiry is upon the intent of the opposing party at the time he exercised his peremptory strikes. See State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272, 287. A reviewing court owes the trial court's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Handon, 952 So.2d at 58.

Defendant contends that three black prospective jurors were peremptorily stricken from the jury by the state: Alton Johnson, Jr., Bryson Scott, and Larri Harvey. Of these three prospective jurors, defendant admits that the state offered a race-neutral reason for excusing Mr. Johnson. However, he contends that the state's proffered race-neutral reason for excluding Mr. Scott and Ms. Harvey was pretextual.

Following voir dire of the first panel of jurors, the trial court first asked for any cause challenges. Defense counsel asked that prospective juror Gerard Ray be excused for cause based upon his friendship with police officers, and the trial court granted this cause challenge. Thereafter, the state exercised peremptory challenges against Mr. Johnson, Mr. Scott, and Ms. Harvey. After the state excused Ms. Harvey, defense counsel lodged a Batson challenge, stating that the state had stricken "all of the black potential jurors on the jury pool." The state first responded that it was incorrect to say it had stricken all of the black prospective jurors, as Mr. Ray was also black and challenged by the defense – over the state's objection – for cause.

In response to Mr. Johnson, the state said it excused him because of his prior service on a jury that had returned a not guilty verdict. Regarding Mr. Scott and Ms. Harvey, the state explained that they – as well as three other presumably non-black jurors (Ms. Pinell, Mr. Thibodeaux, and Ms. Lirette)[FN 2] – were under the age of 35. The state expressed concerns that younger individuals might be familiar with some of the nightclubs that the people involved in the case went to, so the state was attempting to seat an older jury. The trial court denied the Batson challenge, noting that the state was correct regarding the ages of Mr. Scott (24) and Ms. Harvey (34). The trial court also noted that Mr. Johnson has a brother who was in prison for a drug conviction.

[FN 2] At the time of this explanation, Ms. Lirette's name had not been called for acceptance, but she was peremptorily challenged by the state following the trial court's denial of the Batson challenge.

During the pendency of this appeal, this court ordered the trial court to hold a contradictory hearing to determine the age and race of each prospective juror. According to the findings set forth by the trial court, the parties stipulated to the

name and age of each prospective juror. The trial court noted that there was no evidence in the record to indicate the race of the prospective jurors. However, the trial court's findings described an affidavit submitted by defendant's trial counsel, who indicated that three black jurors were peremptorily stricken from the first panel by the state. The trial court also set forth trial counsel's testimony that established the state as having accepted a black female juror on the second panel.

On appeal, defendant contends that the state's proffered race-neutral reason for striking Mr. Scott and Ms. Harvey – their age – was unpersuasive because the state did not strike several young white jurors despite having the opportunity to do so. Defendant highlights the statements from trial counsel's affidavit, which described that the state did not strike prospective jurors Paul W. Daugherty, a 33-year-old white male; Tabitha A. Bienvenu, a 26-year-old white female; and Brandon K. Thibodaux, a 25-year-old white male.

At the time defense counsel lodged the <u>Batson</u> challenge, one black prospective juror had been challenged for cause by defense counsel, and three black prospective jurors had been peremptorily challenged by the state. Of these three individuals excused by the state, defendant admits that Mr. Johnson's peremptory challenge was for a race-neutral reason. He takes issue with the challenges of Mr. Scott and Ms. Harvey because the state alleged their dismissals to be due to their relative youth, but the state later accepted several young white jurors.

After reviewing the record as a whole and considering the totality of the circumstances, we find that the state's race-neutral explanations were reasonable, and the proffered rationales had some basis in accepted trial strategy. <u>See</u> <u>Handon</u>, 952 So.2d at 59. Defendant challenges the state's dismissal of only two black prospective jurors. Notably, defendant himself challenged for cause a black prospective juror that the state wished to accept, and defendant does not challenge as discriminatory the dismissal of Mr. Johnson pursuant to a peremptory challenge. Defendant's proof, then, is the dismissal of two youthful, black prospective jurors and the state's later acceptance of three youthful, white prospective jurors. **At the time of the <u>Batson</u> challenge, these white prospective jurors had not been accepted by the state, and defendant did not re-urge his <u>Batson</u> challenge to give the trial court a chance to address these circumstances.**

**Under these circumstances, it is apparent that the defendant failed to preserve his <u>Batson</u> claim, if any, concerning these prospective jurors.** <u>See</u> La. Code Crim. P. art. 841; <u>State v. Williams</u>, 524 So.2d 746 (La. 1988) (per curiam) ("[t]he <u>Batson</u> decision suggested that the trial judge, if the objections are well founded, can correct the error either by denying the peremptory challenge and reinstating the challenged jurors or by dismissing the venire and selecting a new jury. This suggestion indicates that the ruling on the objections must be made at some time before the completion of the jury panel.)" [Footnotes omitted.]; <u>State v. Dominguez</u>, 2014-1 (La. App. 5th Cir. 8/28/14), 148 So.3d 648, 658, <u>writ denied</u>, 2014-2033 (La. 5/22/15), 170 So.3d 982 ("[t]he ruling, and thus the prerequisite <u>Batson</u> objection, must be made at a time when the trial court can correct any misuse of peremptory challenges. Although jurisprudence has indicated that <u>Batson</u> objections should at least be made 'at some time before the completion of the jury panel,' in order to fulfill the purpose of that principle, a defendant must make a

Batson objection contemporaneously with the State's exercise of the allegedly racially biased peremptory challenges, or at the least, reasonably soon enough thereafter that the stricken jurors have not been dismissed from service."). [Citations omitted.] Thus, defendant's proof at the time of the Batson challenge, when weighed against the state's race-neutral reasons, was not sufficient to prove the existence of discriminatory intent. See Green, 655 So.2d at 290.

 **Moreover,** a review of the entire voir dire transcript indicates that at the time the state began to accept any youthful, white prospective jurors, it had already exercised ten peremptory challenges, seven of which were apparently exercised against non-black prospective jurors. At that time, only six jurors had been seated, and the state had exercised all but two peremptory challenges. Further, defendant admits that a black juror from the second panel was seated as a juror, despite the state holding a peremptory challenge. **Therefore, the transcript does not reveal any evidence that the use of peremptory strikes by the prosecutor was motivated by impermissible considerations.**[FN 3] See Handon, 952 So.2d at 59. **Accordingly, we find no abuse of discretion by the trial court in its denial of defendant's Batson challenge regarding these prospective jurors.**

> [FN 3]   The fact that a prosecutor excuses one person with a particular characteristic and not another similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination. The accepted juror may have exhibited other traits which the prosecutor could have reasonably believed would make him desirable as a juror. See State v. Lee, 2010-2164 (La. App. 1st Cir. 6/10/11), 2011 WL 3427144, *6 (unpublished), writ denied, 2011-1440 (La. 12/16/11), 76 So.3d 1201; see also State v. Elie, 2005-1569 (La. 7/10/06), 936 So.2d 791, 800 ("[notwithstanding the appellate court's observation, the fact jurors of different races share a similar characteristic is not dispositive when deciding whether an explanation has been pretextual."); State v. Drake, 2010-1518 (La. App. 1st Cir. 3/25/11), 2011 WL 1103422, *7 (unpublished), writ denied, 2011-0838 (La. 11/18/11), 75 So.3d 450 ("[e]ven assuming, arguendo, that similar responses were given by other prospective jurors, the fact that some were accepted by the State and the [African-American] prospective jurors in question were excused by the State does not in itself show that the explanation for excusing the other prospective jurors were a mere pretext for discrimination.").

 This assignment of error is without merit.[41]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning reasons.[42]

 When petitioner then asserted this ineffective assistance claim in the state post-conviction proceedings, the state district court denied relief, holding:

---

[41] State v. Jackson, 232 So.3d 628, 632-35 (La. App. 1st Cir. 2017) (emphasis added); State Rec., Vol. 3 of 8.
[42] State v. Jackson, 243 So.3d 566 (La. 2018); State Rec., Vol. 3 of 8.

While the case was pending on appeal, the First Circuit Court of Appeal ordered the Trial Court to hold a contradictory hearing to determine the age and race of each prospective juror regarding a potential Batson claim. On February 21, 2017, this hearing was held by the District Court. Written findings were prepared and submitted to the Court of Appeal on March 30, 2017.

The Court of Appeal reviewed the record as a whole and found that the State's race neutral explanations were reasonable and that defendant's proof was not sufficient to prove the existence of discriminatory intent regarding the claimed Batson challenge. The Court of Appeal found no error on this issue (p. 8-9). The Batson claim is repetitive (La. C.Cr.P. art. 930.4(A)) because same was fully litigated on appeal.

This claim is dismissed.[43]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[44] and the Louisiana Supreme Court thereafter likewise denied relief, simply stating, "Denied. Applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[45]

Regardless of whether or not this claim was properly deemed "repetitive" of the claims raised on appeal (given that the post-conviction claim was one alleging ineffective assistance, while the appellate claim dealt solely with the underlying Batson issue), the appeal decision nevertheless presented petitioner with a significant obstacle. As noted, to prevail on an ineffective assistance claim, a petitioner must establish **both** deficient performance **and** prejudice. Here, even if counsel performed deficiently by failing to properly preserve the error, petitioner has not established that he was prejudiced. Despite counsel's failure to reurge the Batson challenge during the second panel, and despite the Court of Appeal's finding that the failure resulted in the claim not being properly preserved, the Court of Appeal nonetheless addressed the claim in its alternative ruling and found it wanting. Where, as here, the appellate court rejected a petitioner's underlying unpreserved claim on the merits despite counsel's failures, a petitioner has not been prejudiced.

---

[43] State Rec., Vol. 2 of 8, Denial of Request for Postconviction Relief/Order of Finality, p. 4.

[44] State v. Jackson, No. 2021 KW 0189, 2021 WL 1169943 (La. App. 1st Cir. Mar. 29, 2021); State Rec., Vol. 1 of 8.

[45] State v. Jackson, 326 So. 3d 230 (La. 2021); State Rec., Vol. 1 of 8.

See, e.g., Parker v. Ercole, 666 F.3d 830, 834-35 (2nd Cir. 2012) ("[T]o satisfy the second prong of the Strickland test, Parker must show that, but for his counsel's failure to preserve his sufficiency claim, there is a reasonable probability that the claim would have been considered on appeal and, as a result, his conviction would have been reversed. Parker cannot make this showing, however, because the Appellate Division *did*, implicitly, address this claim, even though it had not been preserved at trial. … Therefore, we conclude that Parker cannot satisfy the Strickland standard because, even if his counsel's failure to preserve his sufficiency claim was objectively unreasonable, there is no reasonable probability that, but for that failure, the result of Parker's state-court proceedings would have been different.").

## 2. Right to Testify

Petitioner next contends that his counsel was ineffective for preventing him from testifying on his own behalf at trial. Specifically, he alleges:

> Mr. Jackson informed Katherine [sic] Lirette, Defense Counsel, that he desired to testify in his own defense and was precluded from doing so. Ms. Lirette refused to allow Mr. Jackson to testify on his own behalf, telling Mr. Jackson that if he testified, Mr. Jackson would only "**make things worse.**" Because of this erroneous advice from Ms. Lirette, Mr. Jackson succumbed and did not persist in his request to testify at trial.[46]

In the state post-conviction proceedings, the state district court denied that claim, holding:

> A defendant's silence at trial constitutes a waiver of his right to testify when defendant does not express a desire to testify. Absent extraordinary circumstances that should alert the Trial Court to a conflict between the attorney and the client, the Court should not inquire into a criminal defendant's right to testify. The Court should assume that a defendant by not taking the witness stand has knowingly and voluntarily waived his right to testify. State v. Shaw, 969 So.2d 1233 (La. 11/2/07), State v. Hampton, 818 So.2d 720 (La. 3/22/02).
>
> Defendant has not supported his claim with an affidavit by defendant's trial counsel or any other specific facts from which the Court could reasonably conclude that defense counsel forced defendant not to testify.
>
> Accordingly, this claim lacks merit and is dismissed.[47]

---

[46] Rec. Doc. 1-1, p. 19.
[47] State Rec., Vol. 2 of 8, Denial of Request for Postconviction Relief/Order of Finality, pp. 5-6.

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[48] and the Louisiana Supreme Court thereafter likewise denied relief, simply stating, "Denied. Applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2."[49]

"[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49 (1987). Here, however, petitioner has not offered any **actual evidence** establishing that he wanted to testify at trial or that counsel prohibited him from doing so. That is a critical flaw. For example, in a similar case in which a petitioner alleged that he had been denied the right to testify by his counsel, the United States Seventh Circuit Court of Appeals explained:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary – and also we think some substantiation is necessary, such as an affidavit from the lawyer who allegedly forbade his client to testify – to give the claim sufficient credibility to warrant a further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); accord Beasley v. Vannoy, Civ. Action No. 19-9925, 2020 WL 974930, at *17 (E.D. La. Jan. 24, 2020), adopted, 2020 WL 972749 (E.D. La. Feb. 28, 2020); Watson v. Vannoy, Civ. Action No. 18-10085, 2019 WL 2619917, at *12 (E.D. La. May 21, 2019), adopted, 2019 WL 2617231 (E.D. La. June 26, 2019), certificate of

---

[48] State v. Jackson, No. 2021 KW 0189, 2021 WL 1169943 (La. App. 1st Cir. Mar. 29, 2021); State Rec., Vol. 1 of 8.
[49] State v. Jackson, 326 So. 3d 230 (La. 2021); State Rec., Vol. 1 of 8.

appealability denied, No. 19-30541, 2020 WL 8615600 (5th Cir. Oct. 9, 2020), cert. denied, 141 S. Ct. 1428 (2021); Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D. La. July 26, 2007); White v. Cain, Civ. Action No. 06-1576, 2006 WL 3703240, at *4-5 (E.D. La. Dec. 11, 2006).

And, in any event, it is evident from petitioner's own statement of his claim that counsel did not **prevent** him from testifying – she merely **advised him against it**, and he then took that advice. To the extent that he may now simply be contending that was bad advice, that contention should be rejected for the following reasons.

A decision whether to put a criminal defendant on the stand "is a 'judgment call' which should not easily be condemned with the benefit of hindsight." United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir. 1985); accord United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb. 13, 2008). Such a matter is inherently one of trial strategy, and federal habeas courts generally are not to second-guess counsel's decisions on matters of trial tactics; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy. Strickland, 466 U.S. at 689.

Because a habeas proceeding is far removed from the context of the actual trial, a federal habeas court has no mechanism available to fairly judge counsel's assessment of her own client at the time and her view of the strength of the prosecution's case as it was presented live. Under such circumstances and in light of the deference that must be accorded to counsel's strategic decisions, the federal court should decline to second-guess counsel's decision to advise petitioner against taking the stand at trial. See, e.g., Lewis v. Vannoy, Civ. Action No. 19-10529, 2020 WL 6151108,

at *12 (E.D. La. June 1, 2020), <u>adopted</u>, 2020 WL 6146385, at *7 (E.D. La. Oct. 20, 2020); Lewis

v. Cain, Civ. Action No. 09-2848, 2009 WL 3367055, at *13 (E.D. La. Oct. 16, 2009), aff'd, 444

F. App'x 835 (5th Cir. 2011).

### 3.  Failure to Object to Video Statement

Petitioner next contends that his counsel was ineffective for failing to "forcefully" object

to the introduction of his video statement at trial.  Specifically, he alleges:

> During Mr. Jackson's trial, the State was allowed to present Mr. Jackson's
> video Statement made to police over the objections of Trial Counsel, Ms. Lirette.
> Trial Counsel's contention was that Mr. Jackson had asserted his Constitutional
> right to the assistance of counsel, but that the officer conducting the interview, in
> complete disregard of Mr. Jackson's **Sixth Amendment** right to an attorney,
> coerced and intimidated Mr. Jackson into giving the statement.[50]

He continues:

> Even though trial counsel objected to the video, she failed to forcefully
> argue the fact that Mr. Jackson had asserted his Sixth Amendment right to an
> attorney, and that because of this fact the video statement should have been
> inadmissible.  As a result of trial counsel's lackadaisical attack on the constitutional
> validity of Mr. Jackson's video statement, the Court ultimately ruled the video to
> be "freely and voluntarily made," allowing the video to be played in its entirety.
> This was ineffective assistance of counsel in that Mr. Jackson's trial counsel failed
> to be 'zealous and resolve all doubts and ambiguous legal questions in favor of her
> client,' as any reasonably competent attorney would have.[51]

When petitioner asserted this claim in the state post-conviction proceedings, the state

district court denied relief, holding:

> The record clearly shows that defense counsel objected to the introduction
> of defendant's video statement.  At a hearing outside the presence of the jury, the
> Trial Court found defendant's statement admissible.  He was clearly advised of his
> rights and signed a written waiver of his constitutional rights.
> The admission of this video allowed the jury to see defendant deny his guilt
> and point the finger of guilt at a principal, Ciege Cheramie, who according to
> defendant threatened him at gunpoint and threatened to harm defendant's family.
> Defendant benefited from this exculpatory denial of guilt in front of the jury
> because he was not subject to cross-examination by the prosecutor.

---

[50] Rec. Doc. 1-1, p. 21.
[51] Id. at p. 22 (citations omitted).

>As a matter of trial strategy, this was not ineffective assistance of counsel. Defendant was not placed at risk of cross-examination and the possibility of inculpatory evidence being established on cross-examination.  Defendant's denial was supported by the later testimony of Shadrick Pierron, now deceased, through Lieutenant John Babin who reported that Pierron was told by Cheramie that she shot the victim.  Pierron also stated Cheramie had a 9mm pistol.
>    This claim is without merit.[52]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[53] and the Louisiana Supreme Court thereafter likewise denied relief, simply stating, "Denied.  Applicant fails to satisfy his post-conviction burden of proof.  La.C.Cr.P. art. 930.2."[54]

The transcript does indeed reflect that a hearing on the admissibility of the statement was heard at trial outside the presence of the jury.  During that hearing, defense counsel cross-examined Detective Mitch Legendre, the officer who took the statement, about whether petitioner invoked his right to counsel.  That exchange was as follows:

**BY MS. LIRETTE:**

Q.    Detective Legendre, when you start the conversation you are already, sounds like you are already talking.
        Did you talk for any length of time before the recording started?

A.    No, sir.  No, ma'am.  I'm sorry.

Q.    I know I look bad today but really.
        So if my client – Well, strike that.
        So you heard Mr. Jackson say a few minutes into it right before Mr. Elfert, where he says, well, and I'll quote him, "I don't got no lawyer, man"?

A.    That's correct.

Q.    You heard him say that.
        Do you recall what you told him that you just heard it?  Do you want me to read it to you?

---

[52] State Rec., Vol. 2 of 8, Denial of Request for Postconviction Relief/Order of Finality, pp. 6-7.
[53] State v. Jackson, No. 2021 KW 0189, 2021 WL 1169943 (La. App. 1st Cir. Mar. 29, 2021); State Rec., Vol. 1 of 8.
[54] State v. Jackson, 326 So. 3d 230 (La. 2021); State Rec., Vol. 1 of 8.

A.    Yeah.  What is it?

Q.    (Reading) "You could still tell me what happened."
        You don't consider that a request for a lawyer that he wants a lawyer?

A.    Well, he could have stopped taking at any time.[55]

The trial court then admitted the statement, finding that it was voluntary.  Defense counsel's objection was noted for the record.[56]

Petitioner did not then raise any challenge to the statement's admissibility on direct appeal; instead, he asserted this related ineffective assistance claim on collateral review.  But, again, he does not dispute that defense counsel did in fact object to the statement being admitted – he merely contends that counsel did not object "forcefully" enough.

As an initial matter, this Court would be hard-pressed to find that counsel performed deficiently in this respect.  The objection was made and the basis for the objection (that the statement should be deemed inadmissible because petitioner had invoked his right to counsel) was clear.  Petitioner fails to explain exactly what else he believes counsel should have done at that point.

In any event, even if petitioner could establish that counsel's performance was deficient for not being sufficiently "forceful," his claim would still fail because he clearly cannot show that he was prejudiced for the following reasons.

It is true that, even when he has effectively waived his right to counsel after receiving the Miranda warnings,[57] "if a suspect **requests** counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself

---

[55] State Rec., Vol. 8 of 8, transcript of March 11, 2016, pp. 9-10.
[56] Id. at p. 11.
[57] See Miranda v. Arizona, 384 U.S. 436 (1966).

reinitiates conversation." <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994) (emphasis added).  But

not every **reference** to counsel qualifies as a **request** for counsel:

> Invocation of the <u>Miranda</u> right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." <u>McNeil v. Wisconsin</u>, 501 U.S. [171, 178, 111 S.Ct. 2204, 2209, 115 L. Ed. 2d 158 (1991)].  But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.  See <u>ibid.</u> ("[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of <u>Edwards</u>"); <u>Edwards v. Arizona</u>, [451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L. Ed. 2d 378 (1981)] (impermissible for authorities "to reinterrogate an accused in custody if he has *clearly asserted* his right to counsel") (emphasis added).
>
> Rather, the suspect must **unambiguously request** counsel.  As we have observed, "a statement either is such an assertion of the right to counsel or it is not." <u>Smith v. Illinois</u>, 469 U.S. [91, 97-98, 105 S.Ct. 490, 494, 83 L. Ed. 2d 488 (1984)] (brackets and internal quotation marks omitted).  Although a suspect need not "speak with the discrimination of an Oxford don," *post*, at 2364 (SOUTER, J., concurring in judgment), **he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney**.  If the statement fails to meet the requisite level of clarity, <u>Edwards</u> does not require that the officers stop questioning the suspect.  See <u>Moran v. Burbine</u>, 475 U.S. 412, 433, n. 4, 106 S.Ct. 1135, 1147, n. 4, 89 L.Ed.2d 410 (1986) ("[T]he interrogation must cease until an attorney is present *only* [i]f the individual states that he wants an attorney") (citations and internal quotation marks omitted).
>
> ....
>
> We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who – because of fear, intimidation, lack of linguistic skills, or a variety of other reasons – will not clearly articulate their right to counsel although they actually want to have a lawyer present.  But the primary protection afforded suspects subject to custodial interrogation is the <u>Miranda</u> warnings themselves.  "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." <u>Moran v. Burbine</u>, *supra*, 475 U.S., at 427, 106 S.Ct., at 1144.  A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted.  Although <u>Edwards</u> provides an additional protection – if a suspect subsequently requests an attorney, questioning must cease – it is one that must be **affirmatively invoked** by the suspect.
>
> ....

Of course, when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. … Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. **But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.**

To recapitulate: We held in <u>Miranda</u> that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in <u>Edwards</u> that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. **Unless the suspect actually requests an attorney, questioning may continue.**

<u>Davis v. United States</u>, 512 U.S. 452, 459-61 (1994) (boldface emphasis added).

Here, although petitioner's comment was an acknowledgement that he did not have counsel present, that was not enough to invoke his right to counsel. See <u>White v. Thaler</u>, 522 F. App'x 226, 231 (5th Cir. 2103) (noting that the right had not been invoked where the suspect's comment was "nothing more than an acknowledgment that he had the right to an attorney"). Rather, the suspect must unambiguously request an attorney. In <u>Davis</u>, the suspect had stated, "Maybe I should talk to a lawyer." <u>Davis</u>, 512 U.S. at 455. That statement was found **not** to be an unambiguous request for an attorney that would require the agents to cease their questioning. <u>Id.</u> at 462. Petitioner's comment here was not qualitatively different.

Simply put: Petitioner did not adequately invoke his right to counsel, and, as a result, his statement was admissible at trial. Therefore, even if counsel's objection had been made more forcefully, it would still have failed because, ultimately, it was simply meritless. Accordingly, petitioner was not prejudiced by any perceived lack of forcefulness.

**4.  Calling Petitioner a "Liar" and**

**Questioning His Innocence on the Obstruction Charge**

Petitioner also contends that defense counsel made inappropriate comments and concessions during her closing argument.  Specifically, he alleges:

> During closing arguments, Mr. Jackson's trial counsel, Kathrine [sic] Lirette, told the jury that Mr. Jackson was a "liar."  She furthered this betrayal of Mr. Jackson when, also in closing arguments, she admitted to the jury that Mr. Jackson was guilty of one of the charges and possibly another. [58]

The transcript does in fact reflect that, during her closing argument, Lirette did concede that petitioner lied during the investigation,[59] that he was guilty of the firearms charge,[60] and that he might be guilty of the obstruction charge.[61]

To the extent that petitioner is contending that these statements violated his right to the effective assistance of counsel,[62] that contention should be rejected for the following reasons.

Where, as here, there is no evidence that a petitioner expressly instructed counsel not to make such concessions, such concessions can be a legitimate trial tactic to establish credibility with a jury and are not *per se* constitutional violations.  See, e.g., <u>United States v. Short</u>, 181 F.3d 620, 624-25 (5th Cir. 1999) (concurring with the trial court's assessment that counsel's statements

---

[58] Rec. Doc. 1-1, p. 11.

[59] <u>See</u> State Rec., Vol. 8 of 8, transcript of March 11, 2016, pp. 68 ("We both know that, we all know that Cie Gie and Troy lied.  Mr. Elfert[, the prosecutor,] pointed that out.  He pointed that out clear as can be.") and 73 ("You heard Mr. Jackson being interviewed.  And yes, he told one story.  Yes, he is a liar just like Cie Gie.")

[60] She stated:

> Mr. Jackson is charged with three things.  One of those things is carrying a firearm, having a firearm on him as a convicted felon.  And yes, he, you probably heard it on the video when they asked him about a gun.  He said, oh, no, man, I'm a convicted felon.  I can't have a gun.  Well, yeah, he did.  He had a gun.  That one is a pretty easy one to do.  I'll give you that one.

<u>Id.</u> at p. 75.

[61] She stated:  "But I'm here to tell you that, as far as the obstruction of justice, Mr. Jackson may or may not have done it."  <u>Id.</u>

[62] In addition to any ineffective assistance of counsel claim petitioner is asserting with respect to these statements, he also contends that the concessions violated his separate and distinct **right of autonomy** to decide the objective of his defense.  That autonomy claim is addressed in detail later in this Report and Recommendation.

in closing argument were reasonable in light of the overwhelming evidence of guilt adduced at trial); United States v. Richard, No. 95-10853, 1996 WL 481378, at *1 (5th Cir. Aug. 16, 1996) ("Richard contends that his trial counsel was ineffective in that he conceded Richard's guilt on two counts in his closing argument.  It was a reasonable trial strategy for counsel to concede Richard's guilt on the counts for which the evidence of his guilt was overwhelming in order to successfully challenge the other charges."); Underwood v. Clark, 939 F.2d 473, 474 (7th Cir. 1991) ("Such acknowledgment can be a sound tactic when the evidence is indeed overwhelming (and there is no reason to suppose that any juror doubts this) and when the count in question is a lesser count, so that there is advantage to be gained by winning the confidence of the jury.").

Under the circumstances of this case, the concessions were not so beyond the pale as to constitute ineffective assistance.  In her admissions, counsel actually conceded petitioner's guilt on **only one charge**, namely possession of a firearm by a convicted felon.  But, it must be noted that counsel's concession on that point was of no great consequence – because **petitioner himself had essentially made the same concession** in his taped statement which was played for the jury. Here, counsel simply conceded that petitioner was guilty of a lesser crime to which he had already confessed in order to build credibility with the jury in the hope of securing an acquittal on a much more serious crime (first degree murder) carrying a mandatory life sentence.[63]  That was not an unreasonable tactical decision, despite the fact that it did not ultimately prove successful.  See Martinez v. Dretke, 99 F. App'x 538, 543 (5th Cir. 2004) ("[A]n unsuccessful strategy does not necessarily indicate constitutionally deficient counsel.").

---

[63] See La. Rev. Stat. Ann. § 14:30(C).

## **5.  Failing to Request Funds for an Independent Expert**

Petitioner next claims that his counsel did not provide him with a reliable defense, in that she failed "to move the trial court for funds for an independent expert on behalf of Petitioner, in order to put the state's case to a meaningful adversarial testing process."[64]  Specifically, he contends:

> Mr. Jackson has extensive medical mental health history of ADHD, Schizophrenia, Psychosis, Hearing voices, Substance Abuse (THC, ecstasy, marijuana …).  Although defense counsel put the court on notice of possible mental defect, and the trial court ordered a report from a sanity commission, defense counsel(s) failed to request funds for expert psychiatrists and/or psychologists on behalf of defendant.[65]

He concludes by saying:  "Mr. Jackson's counsels' (Ms. Mustin and Ms. Lirette) deficient performance prejudiced him.  Neither Ms. Mustin nor Ms. Lirette exercised reasonable professional actions by exercising a reasonable amount of investigation into expert opinions.  Mr. Jackson's fundamental right to have the State's case put to adversarial testing was not protected."[66]

In the state post-conviction proceedings, the state district court denied that claim, holding:

> At no time did defendant enter a plea of not guilty and not guilty by reason of insanity.  …  Dr. George Grove and Dr. Meanie [sic] Vega both examined defendant and found defendant competent to stand trial.  A separate *nunc pro tunc* hearing was held where the Trial Court found defendant competent and issued written reasons on February 14, 2018.
> Defendant has presented no factual or medical evidence, nor is there any evidence in the record to suggest that defendant was incapable of understanding the charges against him or assisting in his own defense.  The undersigned trial judge observed no actions or conduct which would support this claim.  Defendant has not shown prejudice.
> Louisiana does not recognize claims of diminished capacity or guilty by mentally ill.  La. C.Cr.P. art. 552, State v. Richardson, 241 So.3d 1201 (La. App. 1 Cir. 1/25/18), State v. Branch, 759 So. 2d 31 (La. 3/17/00).
> This claim is without merit.[67]

---

[64] Rec. Doc. 1-1, p. 23.
[65] Id. at p. 24.
[66] Id. at p. 26.
[67] State Rec., Vol. 2 of 8, Denial of Request for Postconviction Relief/Order of Finality, p. 6.

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning reasons,[68] and the Louisiana Supreme Court thereafter likewise denied relief, simply stating, "Denied.  Applicant fails to satisfy his post-conviction burden of proof.  La.C.Cr.C. art. 930.2."[69]

As the state district court noted in denying this claim, two experts, Dr. George Grove and Dr. Melanie Vega, were appointed to evaluate petitioner[70] in response to defense counsel's request for a sanity commission to assess his competence to stand trial.[71]

The record reflects that Dr. Grove personally examined petitioner on July 10, 2014. Regarding that examination, Dr. Grove stated:

> Mr. Jackson is a young male who appears his stated age.  He was alert and oriented to person place date and time.  He was able to state the year, month, and name of the jail.  His level of attention and concentration was fair.  At times he would be distracted by loud noises and sudden movements in his field of vision, but not to a severe degree.  He answered questions well and without delay.  The speech was normal.  He reported his mood as, "Not too happy – I am never happy".  His affect was blunted.  He did not report any specific thoughts of wanting to harm himself or others and does not have any specific plan or intent at this time.  His affect was congruent with his mood.  His memory was intact.  His abstractions were intact.
>
> Mr. Jackson is not currently endorsing any symptoms of psychosis, such as auditory or visual hallucinations, or any delusional beliefs "its been a while like 2007 or 2008".  His thoughts were linear.  His cognitive skills appear to be in the low normal range of intellectual functioning.  This is just based on my clinical assessment of Mr. Jackson.  His insight into his mood is fair, and his judgment is fair.
>
> He did display a low level of mistrust of others and especially the police and government.  He stated "I don't trust many other people" and "I feel like some people are out to hurt me some kind of way."  Some of his mistrust could be based in factual events such as "This parish is crooked, they are under investigation for wrongful convictions" so that he would be unable to get a fair trial "in this parish".  He also states "the jury is dirty and they will convict me anyway".[72]

---

[68] <u>State v. Jackson</u>, No. 2021 KW 0189, 2021 WL 1169943 (La. App. 1st Cir. Mar. 29, 2021); State Rec., Vol. 1 of 8.
[69] <u>State v. Jackson</u>, 326 So. 3d 230 (La. 2021); State Rec., Vol. 1 of 8.
[70] State Rec., Vol. 3 of 8, Sanity Commission Order.
[71] State Rec., Vol. 3 of 8, Application for Appointment of Sanity Commission.
[72] State Rec., Vol. 3 of 8, Dr. Grove's Report, p. 4.

With respect to the Louisiana Supreme Court's <u>Bennett</u> criteria,[73] Dr. Grove stated:

> This evaluation was performed in order to evaluate the knowledge of the defendant as per the *Bennett Criteria* which are outlined in the State of Louisiana versus Bennett 345 SO 2D 1129 and 1138 (LA 1977).
>
> In my opinion with a reasonable degree of medical certainty, Mr. Jackson currently does have the rational and factual understanding of the proceedings against him. Mr. Jackson does have awareness of the charges and does appreciate its seriousness. He states the charges are "1st degree murder". He does have a clear rational understanding of the process of what it is to take a plea bargain.
>
> Mr. Jackson does understood [sic] the roles of the defense counsel, prosecutor, judge, jury, witnesses, and defendant. Regarding the role of the judge, he said, "the boss of the court room". Regarding the role of the jury, he was able to identify their role. Regarding the role of the defendant, he was again able to identify that this was his role.
>
> Mr. Jackson was able to distinguish between the pleas of Guilty, Not Guilty, and Not Guilty by Reason of Insanity without difficulty. Mr. Jackson also clearly has the rational and factual understanding about how to protect himself and utilize the legal rights available to him. When questioned what makes a trial fair, he says, "Truth." He also did understand the process of plea bargains. Mr. Jackson also does understand the range of possible verdicts and the consequences of conviction.
>
> In my opinion, to a reasonable degree of medical certainty, Mr. Jackson does have the ability to assist in his defense. Mr. Jackson also can maintain a consistent defense and inform his attorney of distortions or misstatements on others. Mr. Jackson is able to make decisions in response to well explained alternatives,

---

[73] In <u>State v. Bennett</u>, 345 So. 2d 1129 (La. 1977), the Louisiana Supreme Court set forth the factors to be considered in in determining a defendant's competency to stand trial, holding:

> The decision as to a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case and the gravity of the decisions with which he is faced. <u>See</u>, Note, 6 Loyola Univ.L.J. at 684; Note, 4 Columb.Hum.Rights L.Rev. at 245; <u>see also</u>, <u>United States v. Masthers</u>, 176 U.S.App.D.C. 242, 539 F.2d 721 (1976). Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. <u>See</u>, <u>State v. Augustine</u>, [252 La. 983, 215 So.2d 634 (1968)]; Robey, <u>Criteria for Competency to Stand Trial: A Checklist for Psychiatrists</u>, 122 Am.J. of Psychiatry, at 616; Note, 6 Loyola Univ.L.J. at 684-85; Note, 4 Columb.Hum.Rights L.Rev. at 245.

<u>Id.</u> at 1138.

and when given hypothetical scenarios, he was able to manage answers to the questions.

    In my opinion, with a reasonable degree of medical certainty, Mr. Jackson can tolerate the stress of trial and while awaiting trial. In my view, Mr. Jackson has adequate verbal skills and average intellectual functioning upon interactions with the examiner. I believe that he would be able to testify with relevancy in his own defense.[74]

Based on the evaluation, Dr. Grove determined both that petitioner was competent to stand

trial and that he had been sane at the time of the alleged offense, stating:

    **SUMMARY OF COMPETENCY TO STAND TRIAL:**
    In my opinion, to a reasonable degree of medical certainty, Mr. Jackson is presently able to demonstrate a rational and factual understanding of the proceedings against him, and does have the ability to assist counsel in his defense with a reasonable degree of rational understanding. Mr. Jackson does meet the *Bennett Criteria* for Competency to Stand trial as outlined in the case of Louisiana versus Bennett (1977).

    **SUMMARY OF SANITY AT THE TIME OF THE ALLEGED OFFENSE:**
    It is my understanding that Mr. Jackson has not entered a plea of Not Guilty by Reason of Insanity to these charges. Regardless, it is my opinion with a reasonable degree of medical certainty, based on the available information of the circumstances regarding the alleged offence, that Mr. Jackson is not suffering from a mental disease or defect that renders him incapable of distinguishing right from wrong with relevance to behavior leading to the alleged charges against him.[75]

In her report, Dr. Vega did not address whether petitioner was sane at the time of the

offense, but she did conclude that he was competent to stand trial. She observed:

    Mr. Jackson reports a history of schizophrenia and ADHD, "that's all I remember." Reports that he has had problems since younger, started taking Ritalin at age six and some other meds like Ritalin when he was a kid. States that at the time, he was having problems with concentration, "it was hard to read." States that later "I became schizophrenic", at about age 20. He reports he started hearing voices, saying different stuff. States that this happened after he got "a hold of some bad weed and took some ecstasy." States that he also has a history of "destroying stuff", like computers and phones, would get really easily angry. Also, he agrees to being depressed, would only sleep a few hours a day, had a poor appetite. Also with a history of hyperactivity, racing thoughts, fighting a lot, when "people would do me stuff." Denies history of visual hallucinations. States that he is always paranoid, feeling like people watching him, trying to set him up. States that he doesn't trust

---

[74] State Rec., Vol. 3 of 8, Dr. Grove's Report, pp. 3-4.
[75] Id. at p. 2.

too many people.  Has never stayed awake for days at a time without using drugs.
Reports that his motivation is poor, not really interested in doing things.  He tries
to stay away from people as much as possible.  Has a lot of anxiety, thinking too
much, nerves are bad, feels restless, gets panic attacks several times a week.  States
that he is always depressed.  He continues to have paranoid thoughts, but denies
current auditory hallucinations.  States that the doctor at the jail started him on some
medicines (doesn't know which ones), but he didn't like the way the medicines
made him feel, so he stopped taking them and doesn't want to take any medications
currently.[76]

She further observed:

He is calm, pleasant, polite, and cooperative.  Well groomed, good eye contact.
States that he is "straight", denies being depressed or nervous.  Speech normal rate
and volume, somewhat monotonous and impoverished.  Affect is mildly
constricted, appropriate for situation.  Thoughts logical and goal directed.  No
current evidence of manic symptoms, psychotic symptoms or response to internal
stimuli.  He denies auditory or visual hallucinations.  He denies suicide or homicide
thoughts currently.  Words: 3/3 0 minutes, and 2/3 at 3 minutes.  He is oriented to
person, place, July 22, 2014.  Able to state US presidents:  Obama, Bush, "don't
remember any before", states that he doesn't keep up with that kind of thing.
World/dlrow.  Insight is fair, judgement is fair.[77]

She then questioned him regarding the <u>Bennett</u> criteria and explored his ability to assist in his

defense,[78] and she ultimately concluded:

To summarize:  although Troy has some continued psychiatric symptoms, I do
believe that he is competent to stand trial at this time, based on the above evaluation.
He would possibly benefit from psychotropic medications; however, he chooses to
not take medications due to side effects.[79]

For the following reasons, the undersigned finds that petitioner's ineffective assistance

claim should be rejected.

First, petitioner's reliance on <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), is misplaced.  In <u>Ake</u>,

the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at

the time of the offense is likely to be a significant factor at trial, the Constitution requires that a

---

[76] State Rec., Vol. 3 of 8, Dr. Vega's Report, pp. 1-2.
[77] <u>Id.</u> at pp. 2-3.
[78] <u>Id.</u> at pp. 3-4.
[79] <u>Id.</u> at p. 5.

State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Id. at 74. However, even if the obligations imposed by Ake were in fact triggered in this case, those obligations were met. As noted, after petitioner sought and secured the appointment of a sanity commission, he was examined by two physicians, one of whom (Dr. Grove, a psychiatrist) expressly concluded that he was not only competent to stand trial but was also sane at the time of the offense. That sufficed to satisfy Ake. See Glass v. Blackburn, 791 F.2d 1165, 1168-69 (5th Cir. 1986).

Second, to the extent that petitioner is arguing that defense counsel should have nevertheless moved for the funds for additional experts to assess petitioner's competence and/or sanity – and, further, that counsel was ineffective for not so moving – his claim has no merit. Even if such funds were available, petitioner has not established that he was prejudiced by counsel's failure to make such a motion. As noted, **all** evidence indicated that petitioner was competent and sane. Not only did the opinions of Drs. Grove and Vega fail to indicate the need for further evaluations, the judge, who observed the petitioner's demeanor and behavior throughout trial, found nothing amiss. Petitioner has offered no evidence in rebuttal, and certainly no evidence indicating that **any** psychiatrist would in fact have been willing to testify that he was either incompetent or insane. In such circumstances, no prejudice has been shown. See, e.g., United States v. Merrill, Crim. Action No. 02-277, 2008 WL 2355728, at *13 (E.D. La. June 5, 2008), aff'd, 340 F. App'x 976 (5th Cir. 2009).

### 6. Cumulative Impact

Lastly, petitioner argues that counsel's errors should be considered cumulatively.[80] However, "[t]he [United States] Supreme Court has never squarely held that the cumulative error

---

[80] Rec. Doc. 1-1, pp. 27-28.

doctrine governs ineffective assistance of counsel claims." Hill v. Davis, 781 F. App'x 277, 280-81 (5th Cir. 2019); accord Chester v. Vannoy, Civ. Action No. 16-17754, 2018 WL 2970912, at *52 (E.D. La. June 11, 2018) ("Although the U.S. Supreme Court's use of the plural 'errors' in the prejudice context suggests Strickland's prejudice prong should be evaluated cumulatively, this Court cannot say such a requirement is clearly established by U.S. Supreme Court precedent."). In any event, where, as here, a petitioner has failed to prove that his counsel was ineffective in **any** respect, "there is nothing to cumulate." Villanueva v. Stephens, 555 F. App'x 300, 308 (5th Cir. 2014); accord United States v. Thomas, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in Strickland."); Pondexter v. Quarterman, 537 F.3d 511, 525 (5th Cir. 2008) ("[T]he district court noted that '[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised'. We agree."); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."); Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000) ("[Petitioner] has not demonstrated error by trial counsel; thus, by definition, [petitioner] has not demonstrated that cumulative error of counsel deprived him of a fair trial."). As the United States Fifth Circuit Court of Appeals noted with respect to analogous claims of cumulative error: "Twenty times zero equals zero." Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987).

### C.  Petitioner was Denied His Right to Autonomy

As noted *supra*, petitioner claims that defense counsel also violated his right to autonomy when, during her closing argument, she conceded that he lied during the investigation, that he was guilty of the firearms charge, and that he might be guilty of the obstruction charge. As he correctly

notes in his discussion, the controlling federal law regarding such autonomy claims is <u>McCoy v. Louisiana</u>, 138 S. Ct. 1500 (2018).[81]

> In <u>McCoy</u>, the United States Supreme Court explained:
>
>> In <u>Florida v. Nixon</u>, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), this Court considered whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial "when [the] defendant, informed by counsel, neither consents nor objects," <u>id.</u>, at 178, 125 S.Ct. 551. In that case, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive. <u>Id.</u>, at 186, 125 S.Ct. 551. We held that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, <u>id.</u>, at 181, 125 S.Ct. 551, "[no] blanket rule demand[s] the defendant's explicit consent" to implementation of that strategy, <u>id.</u>, at 192, 125 S.Ct. 551.
>>
>> In the case now before us, in contrast to <u>Nixon</u>, the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. Yet the trial court permitted counsel, at the guilt phase of a capital trial, to tell the jury the defendant "committed three murders.... [H]e's guilty." We hold that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Guaranteeing a defendant the right "to have the Assistance of Counsel for *his* defence," the Sixth Amendment so demands. With individual liberty – and, in capital cases, life – at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

<u>McCoy</u>, 138 S. Ct. at 1505 (record citations omitted). The Supreme Court further opined that a defendant's acceptance of representation by counsel does not cede to counsel the authority to make all decisions in the case, explaining:

> The choice is not all or nothing: To gain assistance, a defendant need not surrender control entirely to counsel. For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." <u>Faretta [v. California]</u>, 422 U.S. [806,] 819-820, 95 S.Ct. 2525[, 45 L.Ed.2d 562 (1975)]; see <u>Gannett Co. v. DePasquale</u>, 443 U.S. 368, 382, n. 10, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense"). Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as "what

---

[81] <u>See</u> Rec. Doc. 1-1, pp. 11-16.

arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." Gonzalez v. United States, 553 U.S. 242, 248, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008) (internal quotation marks and citations omitted). Some decisions, however, are reserved for the client – notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. See Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*. See Weaver v. Massachusetts, 582 U.S. ——, ——, 137 S.Ct. 1899, 1908, 198 L.Ed.2d 420 (2017) (self-representation will often increase the likelihood of an unfavorable outcome but "is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty"); Martinez v. Court of Appeal of Cal., Fourth Appellate Dist., 528 U.S. 152, 165, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (Scalia, J., concurring in judgment) ("Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State.").

Id. at 1508. The Supreme Court then concluded:

When a client expressly asserts that the objective of "*his* defence" is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt. U.S. Const. Amdt. 6 (emphasis added); see ABA Model Rule of Professional Conduct 1.2(a) (2016) (a "lawyer shall abide by a client's decisions concerning the objectives of the representation").

Id. at 1509.

In so concluding, the Supreme Court held that Strickland does not govern such claims,

explaining:

Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence, Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), to McCoy's claim. To gain redress for attorney error, a defendant ordinarily must show prejudice. See Strickland, 466 U.S., at 692, 104 S.Ct. 2052. Here, however, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative.

Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called "structural"; when present, such an error is not subject to harmless-error review. See, *e.g.*, McKaskle [v. Wiggins], 465 U.S. [168,] 177, n. 8, 104 S.Ct. 944[, 79 L.Ed.2d 122 (1984)] (harmless-error analysis is inapplicable to deprivations of the self-representation right, because "[t]he right is either respected or denied; its deprivation cannot be harmless"); United States v. Gonzalez-Lopez, 548 U.S. 140, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (choice of counsel is structural); Waller v. Georgia, 467 U.S. 39, 49-50, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (public trial is structural). Structural error "affect[s] the framework within which the trial proceeds," as distinguished from a lapse or flaw that is "simply an error in the trial process itself." Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). An error may be ranked structural, we have explained, "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." Weaver, 582 U.S., at ——, 137 S.Ct., at 1908 (citing Faretta, 422 U.S., at 834, 95 S.Ct. 2525). An error might also count as structural when its effects are too hard to measure, as is true of the right to counsel of choice, or where the error will inevitably signal fundamental unfairness, as we have said of a judge's failure to tell the jury that it may not convict unless it finds the defendant's guilt beyond a reasonable doubt. 582 U.S., at —— - ——, 137 S.Ct., at 1908 (citing Gonzalez-Lopez, 548 U.S., at 149, n. 4, 126 S.Ct. 2557, and Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

Under at least the first two rationales, counsel's admission of a client's guilt over the client's express objection is error structural in kind. See Cooke [v. State], 977 A.2d [803,] 849 [(Del. 2009)] ("Counsel's override negated Cooke's decisions regarding his constitutional rights, and created a structural defect in the proceedings as a whole."). Such an admission blocks the defendant's right to make the fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt. McCoy must therefore be accorded a new trial without any need first to show prejudice.

Id. at 1510-11 (record citations omitted).

Petitioner's autonomy claim is flawed because McCoy applies only when counsel overrides her client's **express instruction** not to make a concession. Id. at 1509 ("Presented with express statements of the client's will to maintain innocence, … counsel may not steer the ship the other way.") and 1512 ("The trial court's allowance of [defense counsel's] admission of McCoy's guilt despite McCoy's insistent objections was incompatible with the Sixth Amendment."). Here, there

is no suggestion that petitioner expressly instructed Lirette not to make the concessions at issue. In fact, to the contrary, he indicates that he was blindsided by the concessions, stating:

> At no time did his counsel, Kathrine [sic] Lirette, ever tell Mr. Jackson that she intended to concede his guilt before the jury, so Mr. Jackson never knew of her intentions. **Had he known**, **he would have** vehemently opposed any such concession and **would have** demanded that Ms. Lirette proceed with the defense they had previously agreed upon.[82]

But because he did not know of Lirette's strategy, he did not expressly instruct her not to make the concessions. And, again, that is fatal to this claim – the right of autonomy is not violated unless counsel has made concessions **over her client's express instructions**. See Gonzalez v. Lumpkin, Civ. Action No. 1:20-cv-190, 2022 WL 509038, at *8 (S.D. Tex. Jan. 28, 2022) ("[T]he Sixth Amendment is not violated if the client never disavows or protests a lawyer's decision to strategically admit guilt. Florida v. Nixon, 543 U.S. 175, 188, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Thus, the Sixth Amendment is violated only when the defendant specifically instructs counsel not to concede any portion of guilt and counsel disregards the client's wishes."), adopted, 2022 WL 1063614 (S.D. Tex. Apr. 8, 2022). Therefore, the right of autonomy was not implicated by Lirette's concessions, and McCoy simply does not apply.

### D.  Petitioner Lacked Criminal Culpability Due to "Mental Defect Conditions"

Lastly, petitioner asserts a convoluted claim in which he appears to argue both that he was not competent to stand trial and that he was not legally culpable for his crimes due to a mental defect.[83] For the following reasons, those contentions should be rejected.

As to whether petitioner was competent to stand trial, that contention has already been exhaustively discussed *supra*. To reiterate:  petitioner was personally evaluated by two experts, both of whom determined that he was competent to stand trial; the trial judge who presided over

---

[82] Rec. Doc. 1-1, pp. 11-12 (emphasis added).
[83] Id. at pp. 29-31.

the trial observed nothing which cast doubt on petitioner's competence; the transcript reflects nothing which suggests that petitioner was not competent to stand trial; at a *nunc pro tunc* competency hearing, petitioner was found competent to stand trial,[84] and he did not challenge that finding on direct review; and petitioner has submitted no evidence whatsoever that he was in fact incompetent to stand trial.  Considering all that, petitioner clearly has not met his burden to establish that relief is warranted based on alleged incompetence.

In addition, for the following reasons, petitioner likewise has not met his burden to establish that relief is warranted on the ground that he was not legally culpable for his crimes due to a mental defect.

To the extent that petitioner is contending that he was legally insane at the time he committed the offenses, it must be noted that he did **not** enter a plea of not guilty by reason of insanity in this case.  Moreover, in any event, as noted, Dr. Grove personally evaluated petitioner and found that he was not legally insane at the time of the offense.  Petitioner has presented no evidence whatsoever to rebut that finding.

To the extent that petitioner is contending that, although he was perhaps not legally insane, he nevertheless suffered from a legal defect that prevented him from being legally culpable for his crime, that contention must be rejected.  A mental health issue short of insanity simply is not a defense under Louisiana law.  See, e.g., State v. Pitre, 901 So. 2d 428, 444 (La. App. 1st Cir. 2004) ("Louisiana does not recognize the defense of diminished capacity. A mental disease or defect short of insanity cannot serve to negate an element of the crime.").  Further, if petitioner is arguing that this matter of state law somehow offended his right to due process, he is incorrect.  See, e.g., Clark v. Arizona, 548 U.S. 735, 752-53 (2006) ("[I]t is clear that no particular formulation has

---

[84] Such *nunc pro tunc* competency hearings are permissible, so long as they are "meaningful."  See Wheat v. Thigpen, 793 F.2d 621, 630 (5th Cir. 1986).  Petitioner has not established that the hearing in his case was not "meaningful."

evolved into a baseline for due process, and that the insanity rule, like the conceptualization of criminal offenses, is substantially open to state choice. … [D]ue process imposes no single canonical formulation of legal insanity."); Levier v. Cain, Civ. Action 14-445, 2015 WL 237152, at *5 (W.D. La. Jan. 16, 2015).

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Troy Michael Jackson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[85]

New Orleans, Louisiana, this ___17th___ day of January, 2023.


_____
**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**


---

[85] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.